# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA
### PITTSBURGH DIVISION

| | |
|---|---|
| DONALD ROSE, Individually and For Others Similarly Situated,<br><br>    Plaintiff,<br><br>v.<br><br>EQT CORPORATION,<br><br>    Defendant. | Case No. _____<br><br>JURY TRIAL DEMANDED<br><br>COLLECTIVE ACTION PURSUANT TO 29 U.S.C. § 216(b) |

## COLLECTIVE ACTION COMPLAINT

### SUMMARY

1.     Donald Rose (Rose) brings this lawsuit to recover unpaid overtime wages and other damages from Defendant EQT Corporation (EQT) under the Fair Labor Standards Act (FLSA). *See* 29 U.S.C. § 201 *et seq.*

2.     Rose worked for EQT as an Environmental Inspector.

3.     Rose and the Putative Class Members (as defined below) regularly worked more than 40 hours a week.

4.     But these workers never received overtime for hours worked in excess of 40 hours in a single workweek.

5.     Instead of receiving overtime as required by the FLSA, EQT classified Rose and the Putative Class Members as independent contractors, and these workers received a flat amount for each day worked (a "day rate") without overtime compensation.

6.     Rose or the Putative Class Members never received a guaranteed salary.

7.     This collective action seeks to recover the unpaid overtime wages and other damages owed to these workers.

## JURISDICTION & VENUE

8. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the FLSA. 29 U.S.C. § 216(b).

9. Venue is proper under 28 U.S.C. § 1391(b)(1) as EQT maintains its headquarters in this District and Division.

10. Specifically, EQT maintains its headquarters in Pittsburgh, Pennsylvania, and EQT conducts substantial business operations in and around Pittsburgh, Pennsylvania.

## PARTIES

11. Rose worked for EQT as an Environmental Inspector from approximately January 2018 until May 2018.

12. Throughout his employment with EQT, Rose was paid a day rate with no overtime compensation and was classified as an independent contractor by EQT.

13. In fact, Rose's relationship with EQT was an employer/employee relationship.

14. Rose's written consent is attached as Exhibit A.

15. Rose brings this action on behalf of himself and all other similarly situated workers who were classified as independent contractors and paid by EQT's day rate system.

16. Each of these workers received a flat amount for each day worked and did not receive overtime for hours worked in excess of 40 in a workweek in accordance with the FLSA.

17. The collective of similarly situated employees or putative class members sought to be certified is defined as follows:

> **All inspectors employed by, or working on behalf of EQT, who were paid a day rate with no overtime at any time during the past 3 years** (Putative Class Members).

18. The Putative Class Members are easily ascertainable from EQT's business and personnel records.

19. Defendant EQT is a corporation that maintains its headquarters in Pittsburgh, Pennsylvania and may be served with process by serving its registered agent: **CT Corporation System, 600 North 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101**.

20. EQT recently purchased Rice Energy, and this collective action lawsuit covers all Putative Class Members working for EQT and Rice Energy.

## COVERAGE UNDER THE FLSA

21. At all relevant times, EQT has been an employer within the meaning of the Section 3(d) of the FLSA. 29 U.S.C. § 203(d).

22. At all relevant times, EQT has been an enterprise within the meaning of Section 3(r) of the FLSA. 29 U.S.C. § 203(r).

23. At all relevant times, EQT has been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1). EQT has and has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials – such as tools, cell phones, and personal protective equipment - that have been moved in or produced for commerce.

24. In each of the last 3 years, EQT has had annual gross volume of sales made or business done of at least $1,000,000.

25. At all relevant times, Rose and the Putative Class Members were engaged in commerce or in the production of goods for commerce.

26. EQT treated Rose and the Putative Class Members as employees and uniformly dictated the pay practices applied to Rose and the Putative Class Members.

27. EQT's misclassification of Rose and the Putative Class Members as independent contractors does not alter their status as employees for purposes of the FLSA.

28. EQT's uniform day rate scheme, depriving its employees of overtime compensation for weeks in which these workers work over 40 hours is, in of itself, a violation of the FLSA. 29 U.S.C. § 207(a) & (e).

**FACTUAL ALLEGATIONS**

29. EQT is "the largest producer of natural gas in the United States … with emphasis in the Appalachian Basin and operations in Pennsylvania, West Virginia, and Ohio[.]"[1]

30. To complete its business objectives, EQT hires personnel, such as Rose, to perform inspection services.

31. EQT considers Rose and the Putative Class Members to be contractors.

32. But EQT does not hire these workers on a project-by-project basis.

33. Rather, EQT hires and treats these workers just like regular, even if sometimes short term, employees.

34. Many of these individuals worked for EQT on a day rate basis (without overtime pay).

35. These workers make up the proposed Putative Class.

36. While exact job titles and job duties may differ, these employees are subjected to the same or similar illegal pay practices for similar work.

37. For example, Rose worked for EQT as an Environmental Inspector from approximately January 2018 until May 2018 in and around Clarksburg, West Virginia.

38. As an Environmental Inspector, Rose's primary job duties included inspecting the environmental footprint or effects of oil and case pipelines and facilities.

---

[1] https://www.eqt.com/about/corporate-profile (last visited October 18, 2019).

39. Rose did not have any supervisory duties.

40. Rose did not hire for fire employees.

41. Rose did not exercise discretion and judgment as to matters of significant.

42. To the contrary, Rose worked with his hands.

43. Rose performed manual labor.

44. Rose worked in the elements.

45. Rose does not work in an office.

46. Rose does not manage a business unit.

47. Rose was a blue-collar worker.

48. Throughout his employment with EQT, he was classified as an independent contractor and paid on a day rate basis.

49. Rose and the Putative Class Members work for EQT under its day rate pay scheme.

50. Rose and the Putative Class Members do not receive a salary.

51. In Rose and the Putative Class Members did not work, they did not get paid.

52. Rose and the Putative Class Members receive a day rate.

53. Rose and the Putative Class Members do not receive overtime pay.

54. This is despite the fact that Rose and the Putative Class Members often work more than 12 hours a day, for as many as 7 days a week, for weeks at a time.

55. Although Rose typically worked 6 or 7 days a week, for 12 or more hours a day, he did not receive any overtime pay.

56. Rose and the Putative Class Members received the day rate regardless of the number of hours they worked, and even if they worked more than 40 hours in a workweek.

57. Without the job performed by Rose and the Putative Class Members, EQT would not be able to complete its business objectives.

58. Rose and the Putative Class Members relied on EQT for work and compensation.

59. Rose and the Putative Class Members worked in accordance with the schedule set by EQT and/or its clients.

60. Rose and the Putative Class Members cannot subcontract out the work they are assigned by EQT.

61. Rose and the Putative Class Members must follow EQT and/or its clients' policies and procedures.

62. Rose and the Putative Class Members' work must adhere to the quality standards put in place by EQT and/or its clients.

63. Rose and the Putative Class Members did not substantially invest in the tools required to complete the overall job to which they were assigned.

64. Rose and the Putative Class Members did not possess any specialized or unique skill set.

65. Rose and the Putative Class Members did not market their services while employed by EQT.

66. Rose and the Putative Class Members worked exclusively for EQT during the relevant period.

67. Rose and the Putative Class Members did not incur operating expenses like rent, payroll, marketing, and/or insurance.

68. EQT and/or its clients set Rose and the Putative Class Members' work schedule, which prohibited them from working other jobs for other companies while working on jobs for EQT.

69. At all relevant times, EQT and/or its clients maintained control, oversight, and direction of Rose and the Putative Class Members, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, and other employment practices.

70. Rose's work schedule is typical of the Putative Class Members.

71. EQT controls Rose and the Putative Class Members' pay.

72. Likewise, EQT and/or its clients control Rose and the Putative Class Members' work.

73. Rose and the Putative Class Members' work must adhere to the quality standards put in place by EQT and/or its clients.

74. Rose and the Putative Class Members are not required to possess any unique or specialized skillset (other than that maintained by all other workers in their respective positions) to perform their job duties.

75. EQT knows Rose and the Putative Class Members work for 12 or more hours a day, for as many as 7 days a week.

76. EQT's records reflect the fact that Rose and the Putative Class Members regularly work far in excess of 40 hours in certain workweeks.

77. Rose and the Putative Class Members do not receive overtime for hours worked in excess of 40 in any of those weeks.

78. Instead, Rose and the Putative Class Members are paid on a day rate basis.

79. EQT and/or its clients set these workers' schedules and compensation; supervises them; requires them to adhere to strict guidelines, directive, and its (or its clients') policies and procedures.

80. The work Rose and the Putative Class Members perform is an essential part of EQT's core businesses.

81. EQT does not require any substantial investment by Rose or the Putative Class Members to perform the work required of them.

82. EQT controls Rose and the Putative Class Members' opportunities for profit and loss by dictating the days and hours they work and the rates they are paid.

83. While working for EQT, EQT controlled all the significant or meaningful aspects of the job duties Rose and the Putative Class Members perform.

84. EQT exercises control over the hours and locations Rose and the Putative Class Members work, the tools and equipment they use, and the rates of pay they receive.

85. Even though Rose and the Putative Class Members work away from EQT's offices without the constant presence of EQT supervisors, EQT still controls significant aspects of their job activities by enforcing mandatory compliance with its (or its clients') policies and procedures.

86. No real investment is required of Rose or the Putative Class Members to perform their jobs.

87. More often than not, Rose and the Putative Class Members utilize equipment and/or facilities EQT provides to perform their job duties.

88. Rose and the Putative Class Members do not provide the significant equipment they work with on a daily basis, such as office space, computers, and communication devices.

89. EQT (and/or its clients) make these large capital investments in buildings, machines, equipment, tools, and supplied the business in which Rose and the Putative Class Members work.

90. Rose and the Putative Class Members do not incur operating expenses like rent, payroll, marketing, and insurance.

91. Rose and the Putative Class Members are economically dependent on EQT.

92. EQT set Rose and the Putative Class Members' rates of pay, their work schedules, and effectively prevents them (or outright prohibits them) from working other jobs for other companies while they are working on jobs for EQT.

93. Very little skill, training, or initiative is required of Rose and the Putative Class Members to perform their job duties.

94. Indeed, the daily and weekly activities of Rose and the Putative Class Members are routine and largely governed by standardized plans, procedures, and checklists created by EQT.

95. Virtually every job function is predetermined by EQT (or its clients), including the tools and equipment used at the job site, the data to compile, the schedule of work, and related work duties.

96. EQT prohibits Rose and the Putative Class Members from varying their job duties outside of the predetermined parameters and requires Rose and the Putative Class Members to follow EQT's (or its clients') policies, procedures, and directives.

97. Rose and the Putative Class Members perform routine job duties largely dictated by EQT (or its clients).

98. All of the Putative Class Members perform similar job duties and are subjected to the same or similar policies and procedures which dictate the day-to-day activities they perform.

99. All of the Putative Class Members work similar hours and are denied overtime as a result of the same illegal pay practice.

100. All of the Putative Class Members work in excess of 40 hours each week and often work 84 hours in a workweek.

101. EQT uniformly denies Rose and the Putative Class Members overtime for the hours they work in excess of 40 hours in a single workweek.

102. Rose and the Putative Class Members are not employed on a salary basis.

103. Rose and the Putative Class Members do not, and have never, received guaranteed weekly compensation irrespective of the day worked (i.e., the only compensation they receive is the day rate they are assigned for all hours worked in a single day or week).

104. EQT's day rate policy violates the FLSA because it deprives Rose and the Putative Class Members of overtime for the hours they work in excess of 40 hours in a single workweek.

105. EQT knew Rose and the Putative Class Members worked more than 40 hours in a week.

106. EQT knew, or showed reckless disregard for whether, the Putative Class Members were not exempt from the FLSA's overtime provisions.

107. Nonetheless, Rose and the Putative Class Members were not paid overtime.

108. EQT knew, or showed reckless disregard for whether, the conduct described in this Complaint violated the FLSA.

### COLLECTIVE ACTION ALLEGATIONS

109. Rose brings this claim as a collective action under the FLSA.

110. The Putative Class Members were victimized by EQT's pattern, practice, and/or policy which is in willful violation of the FLSA.

111. Other Putative Class Members worked with Rose and indicated they were paid in the same manner (a day rate with no overtime) and performed similar work.

112. Based on his experiences with EQT, Rose is aware that EQT's illegal practices were imposed on the Putative Class Members.

113. The Putative Class Members are similarly situated in all relevant respects.

114. The Putative Class Members are blue-collar workers.

115. Even if their precise job duties might vary somewhat, these differences do not matter for the purposes of determining their entitlement to overtime.

116. The illegal day rate policy that EQT imposes on Rose is likewise imposed on all Putative Class Members.

117. Numerous individuals are victimized by this pattern, practice, and policy which is in willful violation of the FLSA.

118. The Putative Class Members are similarly denied overtime when they work more than 40 hours per week.

119. The overtime owed to Rose and the Putative Class Members will be calculated using the same records and using the same formula.

120. Rose's experiences are therefore typical of the experiences of the Putative Class Members.

121. The specific job titles or precise job locations of the various members of the Putative Class do not prevent collective treatment.

122. Rose has no interests contrary to, or in conflict with, the Putative Class Members that would prevent class or collective treatment.

123. Like each Putative Class Member, Rose has an interest in obtaining the unpaid overtime wages owed under state and/or federal law.

124. A collective action, such as the instant one, is superior to other available means for fair and efficient adjudication of the lawsuit.

125. Absent a collective action, many Putative Class Members will not obtain redress of their injuries and EQT will reap the unjust benefits of violating the FLSA.

126. Further, even if some of the Putative Class Members could afford individual litigation against EQT, it would be unduly burdensome to the judicial system.

127. Concentrating the litigation in one forum will promote judicial economy and parity among the claims of the Putative Class Members, as well as provide judicial consistency.

128. The questions of law and fact that are common to each Putative Class Member predominate over any questions affecting solely the individual members.

129. Among the common questions of law and fact are:

    a. Whether EQT employed the Putative Class Members within the meaning of the FLSA;

    b. Whether EQT's decision to pay a day rate with no overtime compensation to these workers was made in good faith;

    c. Whether EQT's violation of the FLSA was willful; and

    d. Whether EQT's illegal pay practice applied to the Putative Class Members.

130. Rose and the Putative Class Members sustained damages arising out of EQT's illegal and uniform employment policy.

131. Rose knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a collective action.

132. Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to EQT's records, and there is no detraction from the common nucleus of liability facts. Therefore, this issue does not preclude collective treatment.

133. EQT is liable under the FLSA for failing to pay overtime to Rose and the Putative Class Members.

134. Consistent with EQT's illegal day rate policy, Rose and the Putative Class Members were not paid the proper premium overtime compensation when they worked more than 40 hours in a workweek.

135. As part of their regular business practices, EQT intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Rose and the Putative Class Members.

136. EQT's illegal day rate policy deprived Rose and the Putative Class Members of the premium overtime wages they are owed under federal law.

137. EQT is aware, or should have been aware, that the FLSA required it to pay Rose and the Putative Class Members overtime premiums for all hours worked in excess of 40 hours per workweek.

138. There are many similarly situated Putative Class Members who have been denied overtime pay in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

139. This notice should be sent to the Putative Class Members pursuant to 29 U.S.C. § 216(b).

140. Those similarly situated employees are known to EQT, are readily identifiable, and can be located through EQT's records.

## CAUSE OF ACTION
## VIOLATION OF THE FLSA

141. Rose realleges and incorporates by reference all allegations in preceding paragraphs.

142. Rose brings his FLSA claim as a collective action under 29 U.S.C. § 216(b).

143. EQT violated, and is violating, the FLSA by failing to pay Rose and the Putative Class Members overtime.

144. EQT misclassified the Plaintiff and Putative Class Members for purposes of the FLSA overtime requirements.

145. EQT cannot meet its burden to demonstrate the Plaintiff and Putative Class Members are exempt from overtime under the administrative exemption.

146. EQT cannot meet its burden to demonstrate the Plaintiff and Putative Class Members are exempt from overtime under the executive exemption.

147. EQT cannot meet its burden to demonstrate the Plaintiff and Putative Class Members are exempt from overtime under the professional exemption.

148. EQT cannot meet its burden to demonstrate the Plaintiff and Putative Class Members are exempt from overtime under the highly compensated exemption.

149. EQT misclassified the Plaintiff and Putative Class Members as contractors.

150. EQT failed to guarantee the Plaintiff and Putative Class Members a salary.

151. EQT failed to guarantee the Plaintiff and Putative Class Members a salary.

152. EQT failed to pay the Plaintiff and Putative Class Members overtime.

153. EQT paid the Plaintiff and Putative Class Members a day rate.

154. EQT knowingly, willfully, or in reckless disregard carried out this illegal pattern or practice of failing to pay the Putative Class Members overtime compensation.

155. EQT's failure to pay overtime compensation to these employees was neither reasonable, nor was the decision not to pay overtime made in good faith.

156. Accordingly, Rose and the Putative Class Members are entitled to overtime wages under the FLSA in an amount equal to 1.5 times their rate of pay, plus liquidated damages, attorney's fees and costs.

## JURY DEMAND

157. Rose demands a trial by jury.

## PRAYER

WHEREFORE, Rose, individually, and on behalf of the Putative Class Members respectfully requests that this Court grant the following relief:

   a. An order designating this lawsuit as a collective action and authorizing notice pursuant to 29 U.S.C. § 216(b) to the Putative Class Members to permit them to join this action by filing a written notice of consent;

   b. A judgment against EQT awarding Rose and the Putative Members all their unpaid overtime compensation and an additional, equal amount, as liquidated damages;

   c. Issuance of a declaratory judgment that the practices complained of in this Complaint are unlawful under the FLSA;

   d. An order awarding attorneys' fees, costs, and expenses;

   e. Pre- and post-judgment interest at the highest applicable rates; and

   f. Such other and further relief as may be necessary and appropriate.

Respectfully submitted,

By: /s/ *Michael A. Josephson*
**Michael A. Josephson**
PA Bar No. 308410
**Andrew W. Dunlap**
TX Bar No. 24078444
**Taylor A. Jones**
TX Bar No. 24107823
(*pro hac vice application forthcoming*)
**JOSEPHSON DUNLAP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
713-352-1100 – Telephone
713-352-3300 – Facsimile
mjosephson@mybackwages.com
adunlap@mybackwages.com
tjones@mybackwages.com

**AND**

**Richard J. (Rex) Burch**
TX Bar No. 24001807
**BRUCKNER BURCH PLLC**
8 Greenway Plaza, Suite 1500
Houston, Texas 77046
713-877-8788 – Telephone
713-877-8065 – Facsimile
rburch@brucknerburch.com

**AND**

**Joshua P. Geist**
PA ID No. 85745
**GOODRICH & GEIST PC**
3634 California Ave.
Pittsburgh, Pennsylvania 15212
412-766-1455 – Telephone
412-766-0300 – Facsimile
josh@goodrichandgeist.com

**ATTORNEYS IN CHARGE FOR PLAINTIFF**